[Civ. No. 2613. Third Appellate District.—March 14, 1923.]

## J. B. CURTIN, Respondent, v. STATE OF CALIFORNIA, Appellant.

[1] PUBLIC OFFICERS—APPOINTMENT OF TAX EXPERT—CHARACTER OF EMPLOYMENT.—The act of 1909 (Stats. 1909, p. 779), by provid ing for the appointment or employment of a "person versed in matters relating to taxation," to carry on the work provided for in the act of 1905 (Stats. 1905, p. 390), did not create an office to which was annexed the exercise of a part of the sovereign power of the state, but merely vested in the executive. the authority to enter into a contract of employment with such a person to render for the state services which do not involve the performance of duties belonging to an office within the true meaning of that term.

[2] ID.—PUBLIC OFFICE—DETERMINATION OF CHARACTER OF POSITION. The principal test as to whether a position created by statute is or is not a public office is whether the duties of such position or employment involve the exercise of any part of the sovereign power of the state.

[3] ID.—EMPLOYMENT OF STATE SENATOR AS TAX EXPERT—CONSTITU- TIONAL LAW.—The act of 1909 (Stats. 1909, p. 779), providing

————————

2. What is public office, note, 63 Am. St. Rep. 181.

Distinction between public office and employment, notes, 17 Ann. Cas. 451; Ann. Cas. 1917D, 319.

for the appointment or employment of a "person versed in matters relating to taxation" to carry on the work provided for in the act of 1905 (Stats. 1905, p. 390), not having created an office within the true meaning of that term, the appointment of a state senator as such person was not a violation of section 19 of article IV of the constitution.

[4] ID.—COMPENSATION — QUANTUM MERUIT — INTEREST.—Neither the contract between the Governor and plaintiff nor the statute under which the latter was appointed having fixed a definite or determinate amount to be paid the latter for his services, and his action to recover compensation having been upon a *quantum meruit,* interest was allowable only from the date of the judgment.

[5] ID.—ACTION AGAINST STATE—COSTS.—In an action against the state, under the statute of 1921 (Stats. 1921, p. 1592), the plaintiff cannot be allowed his costs, even though he is victorious in the action.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and R. T. McKisick, Deputy Attorney-General, for Appellant.

Devlin & Devlin for Respondent.

HART, J.—The plaintiff brought this action to recover against the state of California the aggregate sum of $11,947 for services rendered and moneys expended for and in behalf of said state. The authority for the maintenance of such an action against the state is to be found in an act of the legislature of 1921, entitled, "An Act to authorize suits against the state for services rendered to the state or moneys expended in connection with such services, and regulating the procedure therein." (Stats. 1921, p. 1592.)

The plaintiff, from and including the year 1909 to and including the year 1913, which covered the period during which the services for which he herein sues were rendered, was a member of the legislature of the state of California, representing in the senate the twelfth senatorial district. The brief of respondent correctly states the facts and the history of the legislation by and under the authority of

which the plaintiff performed the services and expended the moneys for which he here seeks reimbursement against the state as follows:

"On March 10, 1905, Assembly Concurrent Resolution No. 21 was adopted by the Legislature. (Statutes 1905, p. 1067.) It provided for the appointment of a joint committee of the Senate and Assembly, consisting of four members, two to be appointed by the President of the Senate and two by the Speaker of the Assembly, 'to examine into and report upon all matters connected with or in any way appertaining to the system of revenue and taxation in this state, and to further report such constitutional and legislative measures as may be deemed necessary to the revision and reform of said system of revenue and taxation.' Power and authority was given to the commission so that the investigation would be full and complete, with authority to employ all necessary clerical and expert assistants, to send for persons and papers, and to take all necessary means to procure the attendance of witnesses and testimony. It was further provided, 'that in the event provision is made by law for the existence of a commission for the revision and reform of revenue and taxation in force in this state of which the aforementioned committee is to be a constituent part, then and in that event the joint committee aforesaid and the members thereof are authorized to act as, and be an integral part and portion of, said commission.'

"On March 20, 1905 (Statutes 1905, p. 390) an act which authorized the Governor to appoint an expert in taxation and public finance to sit with the joint committee authorized by Assembly Concurrent Resolution No. 21 when appointed, was passed. The Governor was made an *ex officio* member of said commission. In section 4 of the act, there is, in effect, 'a repetition of the powers given to the joint committee as contained in the concurrent resolution. Section 5 of the act provided that the members of said commission, other than the Governor, as Chairman thereof, and the expert, should be paid for their services the sum of $10.00 per diem and their necessary expenses while actually engaged in the performance of their duties as prescribed in the act. By section 6 an appropriation of $10,000 was made. It is thus recognized by the Legislature that the two Senators and the two Assemblymen who were appointed on the com-

mission were to be paid $10.00 per diem while engaged in the performance of their duties, and in addition thereto their necessary expenses. The act did not provide that any member of the committee should take an oath of office or give a bond. There was no term fixed. There was no time fixed for the making of the report. There was specified work required to be done, to-wit: 'to investigate the system of revenue and taxation in force in this state and to recommend a plan for the revision and reform thereof.' When this investigation of the specific matter was completed and report made, the work directed would be finished. The Governor was authorized to appoint the expert in taxation and public finance to sit with the committee and to be a member thereof. If there was a vacancy caused by any reason in the personnel of either of the Senators or either of the Assemblymen, there was no power of appointment given. If the work was not completed during the term of office of either of the two Senators or of the Assemblymen, it was, nevertheless, to be continued by the committee so appointed by the Legislature until the investigation had been fully made and the recommendations filed. . . .

"There is no evidence that any oath of office was taken by the plaintiff under the act of March 20, 1905. Plaintiff was one of the Senators appointed by the President of the Senate."

It is readily to be seen that the object of the act of 1905 was to facilitate an investigation of the tax system then in vogue in California by persons who had had special experience in the fiscal affairs of the state and to that end acquire information and data and to report the same to the legislature so that the law-making body could have an intelligent basis upon which to reform or correct the defects in the system as it existed at the time of the enactment of the act of 1905. The report of the commission to the legislature of 1907 of its investigations of the matters submitted to it in pursuance of the provisions of the act of 1905 embraced a proposed constitutional amendment, which was subsequently adopted by the legislature of 1907 and submitted to the vote of the electors at the ensuing general election. That proposed constitutional amendment, although supposed to involve the correction or the reformation of the then existing system of taxation and the improvement of said system,

was, nevertheless, upon consideration by the people, regarded as wholly inefficient for the purposes for which it was designed and was, consequently, rejected at the general election in November, 1908. The legislature of 1909, still sensible of the deficiencies in the then existing tax system, and for that reason desiring that the investigation authorized by the act of 1905 should be further pressed and something more practicable evolved and formulated than the scheme contained in the proposed but rejected constitutional amendment, passed the act of 1909. (Stats. 1909, p. 779.) The act of 1909 by reference makes the act of 1905 a part thereof, particularly in so far as are concerned the purposes designed to be accomplished by said acts.

The act of 1909 "authorized the Governor of the State to appoint 'one person versed in matters relating to taxation, and a secretary, who shall be an expert on the science of finance and taxation, to carry on the work' provided for in the act of March 20, 1905, and the persons so appointed were to carry on the work mentioned. J. B. Curtin, the plaintiff, was appointed by the Governor as the 'one person versed in matters relating to taxation,' but no oath of office was required of him or of the Secretary, who was to be an expert in the science of finance and taxation, and no term was fixed, but it was contemplated that the work should be done by the two. There was an appropriation of $5,000 to be used for the purpose of carrying on the work mentioned, and to pay the necessary expenses of the members of the commission while engaged in the performance of their duties and the salary of the expert mentioned, and for all necessary clerical, printing and other expenses connected with the work of carrying out the provisions of the act. While in the act of March 20, 1905, each member of the commission was to receive a per diem of $10.00 while actually engaged in the performance of his duty, the act of March 25, 1909, omitted such provision, but contemplated that the claims for each should be subject to approval by the Board of Control [Board of Examiners?], thus leaving the question of the compensation of the person 'versed in matters relating to taxation' to be fixed from time to time, based upon the reasonable value of his services. The expert, who was to act as Secretary, was to have a salary, but the amount thereof was not mentioned in the act of March 25, 1909. . . . "

The complaint alleges and the answer admits that the plaintiff was on the eighth day of June, 1909, appointed or employed by the Governor of the state as "the person versed in matters relating to taxation" to carry on, in conjunction with the Secretary, who was likewise appointed by the Governor, the work provided for in the acts of the legislature of 1905 and 1909. The complaint further alleges that the plaintiff, continuously during the period from June 8, 1909, to and including June 8, 1913, acted as a member of the commission mentioned in the act of 1909 and performed services for the state of California as such member of said commission, and "that the reasonable value of such services as such member of said commission was and is the sum of $208.25 per month, during the said period hereinbefore mentioned and that no part of said sum has been paid." It is alleged that the labor and services rendered by the plaintiff as a member of said commission and which were accepted by the Governor of the state and by the legislature of the state of California were of great value to the state of California, and "as a result of said labor many millions of dollars of additional revenue not otherwise obtainable as taxes was thereby derived." The complaint then sets forth specifically the amount reasonably due the plaintiff for said services for each of the months from June 8, 1909, to and including June 8, 1913, said amount for each of said months being $208.25, totaling the sum of $10,000. It is further alleged that the appropriation provided for by the act of 1909 proved to be insufficient to carry on the said work, labor, and services called for by said act, "and no part of said money appropriated by said act of March 25, 1909, was ever paid to plaintiff and that in order to complete the said work, labor and services, said plaintiff advanced from his own funds the sum of $1,947." The prayer is for judgment for the sum of $10,000 for the services performed and $1,947 for moneys expended with legal interest on each sum from June 8, 1913, until the rendition of judgment.

The answer, of course, admits the passage of the above-mentioned resolution and acts of the legislature relating to the matter of investigating the tax and fiscal system of the state and the provisions of said resolution and acts as to the appointment of a commission and the duties thereof. It also admits the appointment by the Governor of the plaintiff as

a person versed in matters relating to taxation, as alleged in the complaint. On information and belief it denies that the plaintiff performed the services which he alleges in his complaint he rendered in behalf of the state and that said services were of value to the state and that the plaintiff expended the sum of $1,947 for necessary clerical, printing, traveling, and other expenses connected with the work as a member of said commission. It then alleges that during all times mentioned in the complaint the plaintiff was the duly elected, qualified, and acting senator of the state of California from the twelfth senatorial district thereof; that the appointment of the plaintiff to the position mentioned "was and is in contravention of the provisions of section 19 of Article IV of the Constitution of the State of California, as said section read prior to November 7th, A. D. 1916, and was wholly void and ineffectual."

The court found that during all the times mentioned in the complaint the plaintiff was a senator of the state of California and upon the other issues found in favor of the plaintiff and awarded him judgment for the aggregate amount for which he sues, together with interest at the rate of seven per cent per annum, and costs of suit. The appeal is from said judgment.

The plaintiff testified that he was compensated by the legislature for the services rendered by him pursuant to the act of 1905. The claim here is, as above stated, entirely for services alleged to have been rendered by plaintiff under the act of 1909 for the period of time stated in the complaint. As to the last-mentioned services there is no dispute that the same were performed or rendered as alleged in the complaint and above explained.

It should be stated that the plaintiff testified that, although the statute of 1909 does not require that the appointee of the Governor under said act as "a person versed in matters relating to taxation" shall take or execute an oath of office he (the plaintiff), nevertheless, did take and execute such an oath prior to entering upon the discharge of his duties. Explaining this circumstance, the plaintiff stated that a prepared oath was forwarded to him at his office, and that he paid no attention thereto for several days but finally signed and returned it to the Secretary of State.

[1] The primary and all-important question involved herein is whether the duties imposed upon the plaintiff by the act of 1909 under his appointment by the Governor involved the exercise of the duties of an office or whether the plaintiff was merely employed to perform certain services for the state which have no reference to the sovereign powers of the state. In other words, did the statute of 1909, by providing for the appointment or employment of "a person versed in matters relating to taxation," create an office to which was annexed the exercise of a part of the sovereign power of the state, or does the provision that the Governor may make such appointment merely vest in the executive the authority to enter into a contract of employment with such person to render for the state services which do not involve the exercise of a part of the state's sovereign power?

The theory of the plaintiff is that the act, in pursuance of whose provisions the services for which he here seeks compensation were rendered, did not create an office but merely authorized the Governor to employ "a person versed in matters relating to taxation" for the purpose of gathering data and information upon which the legislature, in the exercise of so much of the sovereign power of the state as the people through their constitution have vested in it, might formulate a system of taxation; and, since the statute does not expressly provide for the compensation of the person versed in matters relating to taxation who might be appointed by the Governor under the act, the plaintiff has proceeded upon a *quantum meruit* upon the theory that his contract with the state was one of employment without any express understanding as to what his compensation should be, precisely as would be the case where a contract had been entered into between individuals for the rendition of services by one with no express agreement as to the compensation to be paid the latter for such services, in such case the person performing the services being entitled, obviously, to the reasonable value thereof.

The contention of the state is that the position to which the plaintiff was appointed by the Governor under the act of 1909 was and is an office and that under the terms of section 19 of article IV of the constitution, as that section read prior to its amendment in the year 1916 (see Stats.

1917 and Extra Session 1916, p. 54), the appointment of the plaintiff was absolutely void for the reason that he was at the time of said appointment a member of the legislature of the state. Said section as it then read provides: "No Senator or Member of the Assembly shall, during the term for which he shall have been elected, be appointed to any civil office of profit under this state which shall have been created, or the emoluments of which have been increased, during such term, except such offices as may be filled by election by the people."

We are of the opinion that the statute of 1909 merely authorized the Governor to enter into an agreement with any person versed in matters relating to taxation to perform the services required by the acts of 1905 and 1909 and that the services so required to be rendered do not appertain to or involve the performance of duties belonging to an office within the true meaning of that term.

"The most essential characteristic of an office is that the incumbent in his individual capacity is clothed with some part of the sovereignty of the state to be exercised in the interest of the public and required by law, and that the duties are of a continuous character as opposed to a mere temporary employment." (*Barker* v. *State,* 69 Ohio St. 68, 72 [68 N. E. 575, 576], citing *State* v. *Brennan,* 49 Ohio St. 33 [29 N. E. 593]; *State ex rel. Armstrong* v. *Halliday,* 61 Ohio St. 171 [55 N. E. 175].)

In *Robertson* v. *Ellis County,* 38 Tex. Civ. 146 [84 S. W. 1097], the action was by an official stenographer of the district court of said county to recover a sum of money alleged to be due him for services rendered as such stenographer. The important question in the case was whether the position of stenographer for said court as created by an act of the legislature of the state of Texas was an office. The Texas court of appeals held that the position was not an office within the meaning of the word "office" as used in a certain section of the constitution of that state and as it is commonly used in all the constitutions throughout the United States. The reasoning of the court in that case is so pertinent to the situation here that we quote from the opinion therein *in extenso* as follows:

"The definition of the term 'office,' as given by Mr. Mechem in his work on Public Officers, is quoted with ap-

proval by our Supreme Court in the case of *Kimbrough* v. *Barnett,* 93 Tex. 301 [55 S. W. 120], and is as follows: 'A public office is the right, authority, and duty created and conferred by law, by which, for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public.' The act authorizing the appointment of official stenographers provides for their appointment by the judges of the district courts, and declares that they shall be sworn officers of the court, and shall hold their office during the pleasure of the court, and further declares that the purpose of such appointment is to preserve the record in all cases for the information of the court jury, and parties, and, to that end, 'it shall be the duty of the official stenographer to attend all sessions of the court; to take full stenographic notes of the oral evidence in every case tried in said court, together with all objections to the admissibility of testimony, the rulings of the court thereon, and all exceptions to such rulings; to preserve all official notes taken in said court for future use or reference and to furnish to any person a transcript of all or any part of said evidence or other proceedings upon the payment to him of the compensation,' etc. Does the act confer upon the stenographer any sovereign function of government? We think not. There is quite a material difference between a public office and a public employment. As said by Chief Justice Marshall, 'Although an office is an employment, it does not follow that every employment is an office.' Mr. Mechem, in his work on Public Officers, says: 'The most important characteristic which distinguishes an office from an employment or contract is that the creation and conferring of an office involves a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit of the public; that some portion of the sovereignty of the country, either legislative, executive, or judicial, attaches for the time being, to be exercised for the public benefit. Unless the powers conferred are of this nature, the individual is not a public officer.' Now, while the fact that the position of stenographer is designated in the act providing for its creation as an office, and that it declares that the person who may be called to perform its

duties 'shall be a sworn officer of the court,' affords some reason for determining it to be such, still it is believed the place possesses none of those sovereign functions of the judicial department of the government to which it relates, to distinguish it from a mere employment to perform a species of service, under public authority, for the assistance and convenience of the court and parties litigant therein, in which no judicial discretion or judgment is involved. The creation of the position, as shown by the very terms of the act, was designed for no other purpose than to provide some one by whom the oral evidence offered, and other proceedings involving objections made to admissibility of testimony, the rulings of the court, and exceptions thereto, might be taken in shorthand, as a method of preserving those matters as they occurred, without delaying trials, to be afterwards transcribed and furnished the court and parties to the suit, to aid them in an accurate and prompt preparation of the record. *The report or transcript of the proceedings by the stenographer is not binding, however, upon the court, and may be adopted or rejected at his discretion. No act which he is authorized to do is independent of the control of others, or vested in him as a supreme power to be exercised as a right or prerogative of a judicial office.* We conclude that while the position of a stenographer, under the statute in this state, may be, in a sense, an office, and the term thereof may continue for a longer period than two years, yet there is no such sovereign function of government embraced in the powers conferred upon the individual performing its duties as brings it within the meaning of the word 'office' as used in the section of the Constitution quoted." (See, also, *Commonwealth* v. *Bush,* 131 Ky. 384 [115 S. W. 249, 251, 252, and cases therein cited] ; *Commonwealth* v. *Gamble,* 62 Pa. 343 [1 Am. Rep. 422] ; *Eliason* v. *Colman,* 86 N. C. 235, and cases therein cited; *McDaniel* v. *Yuba Co.,* 14 Cal. 444; *White* v. *Alameda,* 124 Cal. 95 [56 Pac. 795].)

In the case of *Mulnix* v. *Elliott,* 62 Colo. 46 [156 Pac. 216], the proceeding was for a writ of mandate to compel the auditor of the state to issue to him a warrant for expenses incurred as a member of a joint committee appointed by the two houses of the legislature on the authority of an act of the legislature to make a thorough survey and study

of all institutions, boards, bureaus, departments, commissions, and other subdivisions of the government, and ascertain facts concerning the organization, functions, activities, methods, efficiency of employees, and "such other facts as may be necessary or desirable to enable it [the committee] to make recommendations for the purpose of securing greater economy and efficiency in the state government." It was claimed by the attorney-general in that case, among other things, that the appointment of the members of the legislature as members of the committee so created was void under a section of the constitution of the state of Colorado (art. V, sec. 8), providing that "no Senator or Representative shall during the time for which he shall have been elected be appointed to any civil office under this state," the members of said committee being at the time members of the legislature which passed the act authorizing the appointment of the committee. It was held that the act did not contravene the said provision of the constitution, the court saying: "It [said committee] cannot put any of its recommendations into effect, nor does the act purport to confer upon the committee any executive authority whatever, and hence, from the premise upon which the argument of counsel for the plaintiff in error is based, does not violate either of the constitutional provisions invoked."

It may be added that in the Colorado case the committee appointed under the act and referred to was authorized, as is true in the case at bar, to subpoena witnesses and to compel the production of such books, papers, and documents as it might conceive necessary for the proper discharge of its duties. (See, also, *United States* v. *Germaine,* 99 U. S. 508 [25 L. Ed. 482]; *Bunn* v. *People,* 45 Ill. 397; *Rhoden* v. *Johnston,* 121 Ark. 317 [181 S. W. 128]; *Hall* v. *State of Wisconsin,* 103 U. S. 5 [26 L. Ed. 302, see, also, Rose's U. S. Notes], which involves an extended discussion of the distinction between an office and a contract of employment.)

The foregoing authorities are, it is clear, determinative of the question now in hand against the contention of the attorney-general. It is perfectly plain that the act of 1909 does not delegate either to the commission created by the act of 1905 or the expert in the science of finance and taxation or the "person versed in matters relating to taxation" any part of the sovereign power of the state. As stated,

there were no duties committed to the plaintiff except such as were involved in services he was to render in securing certain desired information upon which the legislature could form some intelligent judgment with regard to the correction of the recognized defects in the then existing tax system of the state. There was no definite tenure fixed for the position to which the plaintiff was appointed. The services to be performed were not of a continuing or permanent nature but were of an intermittent character to be rendered at such times and on such occasions as his convenience or the exigencies of the purpose for which he was appointed might require. The moment that he completed his investigation his services were at an end or to be discontinued. He might have completed his labors within sixty days or within a year or, as was true in this case, it might have required three or four years. As is declared in the brief of counsel for the respondent: ''He was required to keep no place of business for the public use, and he gave no bond,'' and, it may be added, was required to give none. He was not required to execute an oath of office and here we may state that the mere fact that he did so could not and did not have the effect of changing the legal character or status of the services which he was required to render by the act under which he was appointed. His report or that of the commission of which he was a member by virtue of the provisions of the acts in question involved no definitive action, or action which was binding upon the legislature or upon the state. Such report could be adopted or rejected at the will or in the discretion of the legislature. In fact, the services which he was required to perform under his appointment or employment by the Governor merely involved work which may well be said to be analogous to the work of an architect with whom the state had entered into a contract for the furnishing of plans for a state building or a person employed to superintend the construction of a state building or similar in character to the letting of contracts by the state for the printing or publication of books or other documents required for the state's use in the administration of the affairs of the government. No one would say that a contract for the construction of a public building between the state and a contractor or a contract for the publication of books issued under the authority of the state would involve the delegation

to the contractor in such cases of any part of the sovereign power of the state. And we repeat in a different form of language that there can be no distinction discernible between the arrangement made by the Governor with the plaintiff in this case under the acts in question and any other contract the state might make within the scope of its authority with a contractor for services rendered either in erecting a building for the state or in printing necessary public documents or in investigating various departments of the state with a view of formulating a plan for the correction of any abuse which might exist therein or for managing them more efficiently and economically than they might have been administered. [2] In brief, while the definitions given by the adjudicated cases of a public office are generally or substantially the same and are governed by the facts and circumstances of each particular case, the principal test as to whether a position created by statute is or is not a public office is whether the duties of such position or employment involve the exercise of any part of the sovereign power of the state; and it is clear, as the authorities above referred to point out, and as seems to be plain upon the very face of the proposition as it is presented upon the facts in this case, that the position to which the plaintiff was appointed under the act in question was not only lacking in permanency of tenure and the conclusiveness of the work imposed by said position, which are some of the characteristics of a public office, but that it did not commit to the plaintiff the exercise of any portion of the sovereign power of the state. [3] It follows, therefore, that his appointment involved a contract of employment and did not violate section 19 of article IV of the constitution.

The conclusions announced in the California cases cited by the attorney-general are not, in our opinion, at cross-purposes with the conclusion to which we think the facts of this case irresistibly lead. (See *Patton* v. *Board of Health, etc.*, 127 Cal. 388 [78 Am. St. Rep. 66, 59 Pac. 702]; *Wall* v. *Board of Directors, etc.*, 145 Cal. 468 [78 Pac. 951]; *Coulter* v. *Pool*, 187 Cal. 181 [201 Pac. 120].)

The Patton case appears to be more particularly relied upon than the other cases cited. In that case it was held that a health inspector appointed as such by the board of health of the city of San Francisco by authority of section

3009 of the Political Code, was a public officer within the meaning of section 16 of article XX of the constitution. But, as is pointed out in that case, the board of health of the city of San Francisco, being clothed with large and extensive powers and duties, having by virtue of section 3012 of the Political Code "general supervision of all matters appertaining to the sanitary condition of the City and County," was authorized by the statute "to devolve upon the health inspectors such portion of its powers and duties as the board may deem best for the good of the public service. So far as the evidence shows," proceeds the court in that case, "the duties thus delegated to the inspectors are not extensive, but they cannot be said to be unimportant or purely ministerial or *lacking in the requirements of judgment and discretion.*" The court further said in the Patton case: "It seems to be reasonably well settled that where the legislature creates the position, prescribes the duties, and fixes the compensation, and these duties pertain to the public and *are continuing and permanent, not occasional or temporary,* such position or employment is an office and he who occupies it is an officer. In such case, there is an unmistakable declaration by the legislature that some portion, great or small, of the *sovereign functions* of government are to be exercised for the benefit of the public," etc.

(The italics in the foregoing quotations are ours.)

Thus it is to be observed that the court in the Patton case finds that the office of health inspector of the city of San Francisco possessed all the characteristics of a public office as the same is defined by the authorities first hereinabove referred to. Moreover, the court in the Patton case referred approvingly to the distinction drawn by *Bunn* v. *People,* 45 Ill. 397, between an employment and a public office, it being held in said case that the commissioners appointed under an act of the legislature to superintend the construction of the state house were not officers within the meaning of the constitution, but were agents or employees for a single and special purpose, "whose functions ceased upon the completion of the work." Further referring to the Bunn case the court said in the Patton case:

"The question was subsequently regarded in that state [Illinois] of sufficient importance to call for a constitutional definition, and hence in 1870 the constitution ordained the

following: 'An office is a public position created by the constitution or law, continuing during the pleasure of the appointing power or for a fixed term with a successor elected or appointed. An employment is an agency for a temporary purpose, which ceases when that purpose is accomplished,'" citing Illinois constitution of 1870, article V, section 24.

The foregoing definition of an employment is in effect approved by the court in the Patton case, and, as we have above shown and as must be obvious upon the slightest reflection, the employment by the plaintiff in this case under the act of 1909 comes within the definition given of "an employment" by the Illinois constitution just quoted herein, since the employment was for a temporary purpose and was to cease, and did cease, upon the accomplishment of the purpose of the employment or agency.

The other cases cited by the attorney-general come no nearer supporting his contention here than the case of *Patton* v. *Board of Health, supra.* It is not necessary to review those cases herein.

[4] Another question arising in this case is whether the plaintiff was entitled to interest upon the indebtedness due him from the state. Section 5 of the act of 1921, authorizing suits against the state for services rendered to the state, etc., provides: "In case judgment be rendered for the plaintiff in any such suit, it shall be for the amount actually due from the state to the plaintiff, with legal interest thereon from the time the obligation accrued, and without costs."

Undoubtedly, under that provision of said statute, if the contract between the Governor and the plaintiff had fixed a definite or determinate amount to be paid the latter for his services he would be entitled to interest upon any amount due him from the state for the services so rendered. In this case, however, there was no definite or any sum provided in the statute of 1909 for the compensation of the plaintiff and the action is upon a *quantum meruit*, which means, of course, that the exact amount, if any, to which the plaintiff would be entitled for his services was uncertain until the same had been determined by the court upon the presentation of evidence showing the amount, character, and value of the services rendered. In such cases it has been held

that interest is not allowable, upon the theory "that the person liable does not know of the sum he owes, and therefore can be in no default for not paying." (*Cox* v. *McLaughlin,* 76 Cal. 60 [9 Am. St. Rep. 164, 18 Pac. 100]. See, also, *Brady* v. *Wilcoxson,* 44 Cal. 239; *Coburn* v. *Goodall,* 72 Cal. 498 [1 Am. St. Rep. 75, 14 Pac. 190]; *Heald* v. *Hendy,* 89 Cal. 632 [27 Pac. 67]; *Easterbrook* v. *Farquharson,* 110 Cal. 317 [42 Pac. 811]; *Erickson* v. *Stockton & Tuolumne Co. R. R. Co.,* 148 Cal. 206 [82 Pac. 961]; *American Hawaiian etc. Co.* v. *Butler,* 17 Cal. App. 764 [121 Pac. 709]; *Robinson* v. *American Fish etc. Co.,* 17 Cal. App. 212 [119 Pac. 388]; *Courteney* v. *Standard Box Co.,* 16 Cal. App. 600 [117 Pac. 778]; *Keyes* v. *Nims,* 43 Cal. App. 1, 15 [184 Pac. 695]; *Haun* v. *Rosenmayer,* 46 Cal. App. 353 [189 Pac. 117]; Civ. Code, sec. 1917.) It follows that interest must be disallowed and a modification of the judgment ordered accordingly.

[5] The court below erroneously awarded plaintiff costs of suit. The statute of 1921, *supra,* expressly provides that in an action against the state in pursuance of its provisions the plaintiff shall not, if victorious in the action, be allowed his costs.

The judgment is hereby modified by striking out the sum of $8,757.10, being interest erroneously allowed on the amount recovered by the plaintiff, and also by striking out the costs awarded plaintiff, and as so modified the judgment is affirmed.

Burnett, J., and Finch, P. J., concurred.