

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

WAGGONER CARR
ATTORNEY GENERAL

October 18, 1965

Honorable John Winters, Commissioner
State Department of Public Welfare
Austin, Texas

Opinion No. C-528

Re: Is the State Department of
Public Welfare authorized
to set up a Day Care
Advisory Committee consisting
of representatives of other
State Departments or Agencies
and representatives of other
professional and civic groups
for the purpose of complying
with the federal requirement
and agreement which is the
basis for the Department's
receiving federal funds for
the Day Care Program in the
State of Texas, and related
Dear Mr. Winters:                          questions?

Your recent letter requests an opinion on the above
captioned matters and from which we quote in part:

"The Commissioner of Public Welfare appointed
a Day Care Advisory Committee consisting of
representatives from other State Agencies
and representatives of other professional
and civic groups interested in the development
of Day Care Services for Children in the State
of Texas.

"In preparing for a meeting of the Day Care
Advisory Committee, we discussed with the
Comptroller's Office the method of payment
of the per diem and the travel expenses and
we were advised that payment could not be
made. The Department is proposing to pay
the Committee members per diem and travel
expenses on the same basis as per diem and
travel expenses are provided for State
employees under Part V, Section 13, of
House Bill No. 12. All of the funds to be

used for this purpose are funds <u>allocated
by the United States Government</u> for the
purposes of carrying out the provisions of
Title V, Part 3, Section 523(a) (1) (B) of
the Federal Social Security Act.

"The Comptroller's Department stated that
payment would not be made on the basis that:

"1.  The Department did not have any
     specific statutory authority to
     appoint a Day Care Advisory
     Committee or to pay the expenses
     of members of such Committee
     while attending official meetings;
     and

"2.  That employees of other State
     Agencies could not serve on such
     Committee without possibly jeopard-
     izing their salaries with the
     employing State Agency.

"The Department takes the view that it does
have the statutory authority to appoint a
Day Care Advisory Committee and to pay the
per diem and travel expenses of the members
of such Committee while attending official
meetings . . .

" . . .

" . . . Since the appointment of the Advisory
Committee is a condition precedent to the
Department's obtaining approval of its State
Plan for Child Welfare Services, the Depart-
ment feels that it should, and that it can,
legally pay these Committee members per diem
and travel expenses actually incurred in the
course of the performance of their duties as
Committee members.

" . . .

"The question has also been raised as to the
the authority of representatives of other
State Departments to serve as members of this
Advisory Committee. We understand that the
basis for questioning their authority to serve
is that they would be holding two positions of

honor and trust at the same time, and
therefore, would be unable to receive
their salary from the employing State
Agency . . . .

"    . . .

"    . . . The Federal Laws providing for
the Advisory Committees require that the
Advisory Committee include among its
members representatives of other State
Agencies concerned with day care, or
services related thereto, as well as
representatives of professional or civic
groups.  To eliminate people from other
agencies would mean that we would be
deprived of the experience and knowledge
of persons in closely related fields
such as Education, Health, and Extension
Service, which is badly needed in the
development of good Day Care Programs
in this State.

"The purpose of the Committee as stipulated
in the Law and the agreement with the
United States Children's Bureau, is to
interest as many different segments of the
population as possible with the view of
extending and strengthening the services
available in communities for the protection
and care of children who are cared for away
from their own homes.  By working with
Advisory Committees, the Department is
better able to serve the needs of children
being cared for in day care centers.

"    . . .

"We shall appreciate your opinion on the
following questions:

"1. Is the State Department of Public
Welfare authorized to set up a Day Care
Advisory Committee consisting of repre-
sentatives of other State Departments or
Agencies and representatives of other
professional and civic groups for the pur-
pose of complying with the Federal re-
quirement and agreement which is the
basis for the Department's receiving
Federal funds for the Day Care Program
in the State of Texas?

"2.   If you answer Question No. one (1) in the affirmative, then is the State Department of public Welfare authorized to pay for the per diem and the travel expenses of those members of the Committee who are not employees of other State Departments or Agencies out of Federal funds made available to the Department for the extension of the Day Care Program?

"3.   If you answer Question No. one (1) in the affirmative, may employees of other State Departments serve on this Day Care Advisory Committee without jeopardizing or losing their salaries from the other State Agency?

"4.   Is the State Department of Public Welfare empowered to set up other types of Advisory Boards or Committees of Public Welfare (unrelated to Day Care Advisory Committees) which are essential to the accomplishment of the other purposes of the Public Welfare Programs in Texas in accordance with the Department's agreements with the Federal Government?

"5.   If the Department does have the authority to set up essential Advisory Boards or Committees for any purpose it deems appropriate and essential to the accomplishment of the purposes set out in the Public Welfare Act, and other related State Statutes such as those providing for Medical Assistance under the Federal Social Security Act, does the Department have the authority to pay the per diem and travel expenses solely out of Federal Funds when the State Department finds it necessary to request such members to attend meetings for the purpose of carrying out the provisions of these Acts?"

In answering your first question, it is first necessary to examine and interpret both the pertinent federal and state statutes, together with their policy basis.   The Federal Social Security Act provides in Title V, Part 3 (42 U.S.C., Subchapt. V) for Child Welfare Services and the allocation and appropriation of federal funds to the states which approve State Plans for the purpose of establishing, extending, and strengthening

such services within the state. In addition to various other provisions therefor in the state, a specific provision is made in the federal statute for the allocation and appropriation to the states for the express purpose of providing "Day Care Services". The law further makes it mandatory that the state, through its department administering the program, appoint a Day Care Advisory Committee. Title V, Section 523 (a) (1) (B) provides in part as follows:

"Sec. 523. (a) From the sums appropriated therefor and the allotment available under this part, the Secretary shall from time to time pay to each State --

"(1) that has a plan for child-welfare services which has been developed as provided in this part and which--

"(A) . . .

"(B) provides, with respect to day care services (including the provision of such care) provided under the plan --

"(i) for cooperative arrangements with the State health authority and the State agency primarily responsible for State supervision of public schools to assure maximum utilization of such agencies in the provision of necessary health services and education for children receiving day care,

"(ii) for an advisory committee, to advise the State public welfare agency on the general policy involved in the provision of day care services under the State plan, which shall include among its members representatives of other State agencies concerned with day care or services related thereto and persons representative of professional or civic or other public or nonprofit private agencies, organizations, or groups concerned with the provision of day care, (underscoring added for emphasis)

"(iii) . . .

"(iv) for giving priority, in determining the existence of need for such day care, to members of low-income or other groups in the population and to geographical areas which have the greatest relative need for extension of such day care, and"

Section 523 (a) (2) also in part provides:

> ". . . Provided, that in developing such services for children the facilities and experience of voluntary agencies shall be utilized in accordance with child-care programs and arrangements in the States and local communities as may be authorized by the State."

Rules and regulations for the implementation of this statute have been subsequently promulgated by the Department of Health, Education, and Welfare, Social Security Administration. In this connection and in order for the particular state to participate in the federal allotment for Day Care Services, which is but another facet of Child Welfare Services, the "Handbook For Child Welfare Services" has been published, setting out the mandatory provisions for the State Plan. See Chapter III, Subitem G.

The Texas Legislature has made provision for the State Department of Public Welfare's authority so to cooperate with the federal government and to accept and expend such funds in accordance with approved State Plans, as shown by Section 4, subsection (4) and (7) of Article 695c, V.C.S. of Texas, such Act being titled "Public Welfare Act of 1941," subsection (7) having been up-dated and amended by Acts 1963, 58th Leg., p. 700, ch. 257, Sect. 1, effective April 12, 1963.

Pertinent subsections in part are quoted:

> "Sec. 4. The State Department shall be charged with the administration of the welfare activities of the State as hereinafter provided. The State Department shall:
>
> "(1) . . . .
>
> "(2) . . .
>
> "(3) . . . .
>
> "(4) Cooperate with the Federal Social Security Board, created under Title 7 of the Social Security Act enacted by the Seventy-fourth Congress and approved August 14, 1935, and any amendment thereto, and with any other agency of the Federal Government in any reasonable manner which may be necessary to qualify for Federal Aid . . . .
>
> "(5) . . . .

"(6) . . .

"(7)  Establish and provide such method of
local administration as is deemed advisable,
and provide such personnel as may be found
necessary for carrying out in an economical
way the administration of this Act.  To
serve in an advisory capacity to such local
administrative units as may be established,
there may be also established local advisory
boards of public welfare, which boards shall
be of such size, membership, and experience as
may be determined by the Commissioner of the
Department of Public Welfare to be essential
for the accomplishment of the purposes of
this Act not in conflict with or duplication
of other laws on this subject;" (Underscoring
added for emphasis)

Section 8 of Article 695c, Vernon's Texas Civil Statutes
specifically designates the State Department of Public Welfare
as the State Agency to cooperate with the United States
Children's Bureau, and sets forth the manner in which such
cooperation may be accomplished:

"Sec. 8.  The State Department is hereby designated as
the agency to cooperate with the Children's Bureau of
the United States Department of Labor in:

"(1) Establishing, extending, and strengthening,
especially in predominantly rural areas, public
welfare services for the protection and care of
homeless, dependent, and neglected children in
danger of becoming delinquent; and

"(2) Developing State services for the encouragement
and assistance of adequate methods of community
child welfare organization and paying part of the
cost of district, county or other local child wel-
fare services in areas predominantly rural and in
other areas of special need; and as may be deter-
mined by the rules and regulations of said State
Department; and

"(3) Developing such plans as may be found
necessary to effectuate the services contemplated
in this Section, and to comply with the rules and
requirements of the Children's Bureau of the United
States Department of Labor issued and prescribed

in conformity with, and by virtue of the
Federal Social Security Act as amended."
(Underscoring added for emphasis)

The State Department of Public Welfare is also designated
as the State Licensing Agency for children's facilities,
including Day Care Centers, and is authorized to set up
standards and promulgate rules and regulations for the adminis-
tration of the Licensing Program.  See Section 8(a) of Article
695c for specific reference.

House Bill No. 12, Acts of the 59th Legislature, Regular
Session, 1965 (the General Appropriations Act for the biennium
beginning September 1, 1965 and ending August 31, 1967),
appropriates the Federal funds and stipulates the conditions
under which such funds may be expended.  Reference is made to
Article V, Sections 27 and 28 of said General Appropriations
Act which provide as follows:

"Sec. 27.  FEDERAL FUNDS APPROPRIATED FOR USE.  Any funds
received by the agencies of the State named in this Act
from the United States Government are hereby appropriated
to such agencies for the purposes for which the Federal
grant, allocation, aid, or payment was made, subject to
the provisions of this Act.  Within thirty (30) days
after the receipt of any such Federal grants, allocations,
aid or payments, the amounts thereof and the purposes for
which they were made shall be reported to the Governor
and the Legislative Budget Board.  (Underscoring added
for emphasis)

"Sec. 28.  FEDERAL CONTRACTS AND AGREEMENTS.  None of
the Federal funds appropriated for use by the terms of
this Act may be expended pursuant to a contract or
agreement with the Federal Government unless and until
the appropriate State agency has filed a copy of such
contract or agreement with the Secretary of State for
recording.  Provided, however, that copies of research
contracts classified in the interest of National Security
shall not be filed, but in lieu thereof a statement that
such a contract has been made shall be filed."  (Under-
scoring added for emphasis)

From your letter, you advise that ever since the enact-
ment of Senate Bill No. 118, Acts of the 52nd Legislature,
Regular Session, 1951, your Department has consistently com-
plied with the provisions of that law as well as the pro-
visions as contained in the General Appropriations Act
pertaining to the filing of federal contracts.  It further

appears that The State Plan for Child Welfare Services which was developed by your Department was approved by the Department of Health, Education, and Welfare, United States Children's Bureau, and all subsequent amendments thereto have been filed in accordance with the above cited provisions of the law.  The current official State Plan for Child Welfare Services was filed in the Office of the Secretary of the State of Texas on July 13, 1965, which is, in essence, the contractual agreement between the State Department of Public Welfare and the Department of Health, Education and Welfare, United States Children's Bureau for the operation of the Child Welfare Services Program in this state.  It contains provisions in relation to Day Care Advisory Boards or Committees.  The structure, need, and functions of the Committee are evidenced in Item (b) of the Annual Budget Narrative, effective July 1, 1965, B. pg. 8, "State Plan for Child Welfare Services," covering the federal fiscal year ending June 30, 1966, from which we quote:

> "(b) A Day Care Advisory Committee to the State Department of Public Welfare has been formed.  Members have been used for consultation and advice in various ways during the year.  The members are considered a representative group from the point of view of geography and individuals concerned with day care.  The State Departments of Health and Education are represented.  There is a high concentration of persons with background training in preschool education.

> "The Day Care Advisory Committee meets on a quarterly basis in the offices of the Department of Public Welfare, Austin, Texas.  The major focus of the committee is to evolve guides regarding ways in which the Department of Public Welfare can better utilize existing day care services and encourage development of other public and private day care services where gaps exist.  Some of the issues to be studied are:

> "(1)  Current observations and attitudes about day care as seen by Committee members.

> "(2)  Present status of the Department's role in the extension and strengthening of day care services.

> "(3)  Relationship and use of existing voluntary non-profit day care services and commercial day care facilities.

"(4)   What are the gaps in day care services,
        if any, and if there are gaps, what are
        the solutions?

"(5)   Revision of the non-profit day care
        standards.

"(6)   Extension of training resources on a
        State-wide basis for day care personnel."

Provision is made in the State Plan for meetings of the Day
Care Advisory Committee on a quarterly basis in the office
of the Department of Public Welfare in Austin, and for
participation of representatives of the Advisory Committee
in other meetings, some of which could be held in Washington,
D.C. upon call by the United States Children's Bureau. It
would seem that as a practical matter, meetings at least on
a quarterly basis are essential if the Committee is to function
on an effective basis, and members must also be permitted to
participate in meetings on a national level if indicated.

Item 7, Subitem (7) appearing on B. Page 11 of such State Plan
definitely commits the Department to pay such expenses and
provides as follows:

> "(7) _Advisory Committees_ - Federal funds will be used
> to pay the expenses of the Day Care Advisory Committee'
> to the State Department of Public Welfare to attend
> quarterly meetings for the purposes of carrying out
> the functions as stated in 5(b) above. Delegates
> from the Day Care Advisory Committee may also be sent
> to state and/or national day care meetings to gain
> knowledge in behalf of the Department of Public
> Welfare for the extension and strengthening of day
> care services. The expenses may include travel, per
> diem and/or registration fees."

We observe that this statute was enacted for the pro-
tection of children and for the public welfare and as such
should be given a liberal construction, since in its observance,
the public is held to have an interest. _Small v. State_, 360
S.W.2d 443 (Tex.Civ.App., 1962, error ref.). Such general
statutes must be accorded a liberal construction and given the
most comprehensive application of which it is susceptible to
effectuate the legislative object or public purpose and to
promote the public interest and welfare. 53 Tex.Jur.2d 298,
Sec. 194; Sec. 203, p. 309, Statutes; _Friedman v. American_

Surety Co. of New York, 137 Tex. 138, 151 S.W.2d 570 (1941), holding that unemployment and public welfare laws are legitimate purposes within the powers of the administration of government. Under this construction, not only all powers and authority expressly granted will be upheld, but all those which may be reasonably inferred or implied are to be read into such a statute.

We are unable to find any law which prohibits the state Department of Public Welfare from appointing an Advisory Board or Committee of Public Welfare, such as a Day Care Advisory Committee, nor any law which is in conflict with Section 4 of Article 695c, which expressly authorizes the establishment of Advisory Boards of Public Welfare. Construing the statute so as to give it the broadest or most comprehensive application of which it is susceptible, as we must, we hold that it was unnecessary for the statute to enumerate specifically the various types of committees which are authorized to be appointed. The statute is sufficiently comprehensive, and the legislative intent therein sufficiently clear, to imply the power and authority for the appointment of the required Advisory Committees or Boards for any phase of such public welfare, the responsibility of which is placed in the Department of Public Welfare, as covered and set out in the statutes. The general wording in the statute, construed as a whole, empowers the Commissioner to appoint such advisory boards or committees for such purposes as are reasonably appropriate and essential for the accomplishment of the purposes of the Welfare Act in the absence of any other conflicting laws on the subject. For in broad general terms The Public Welfare Act authorizes the Department to perform any and all acts not inconsistent with the law for the purpose of carrying out the provisions of the state and federal laws authorizing the Public Welfare Programs in Texas.

We are unable to find anything in the Texas Constitution which would prohibit such a construction of the Act as we make herein. Section 51, Article III of the Texas Constitution, prohibiting the Legislature from making any grant, or authorizing the same, of public moneys to any individual, association of individuals, municipal or other corporations, is not given a strict application but is held to be inapplicable where a public purpose for the expenditures is present. State v. City of Austin, 160 Tex. 348, 331 S.W.2d 737 (1960); Brown v. Galveston, 97 Tex. 1, 75 S.W.2d 488 (1903); Bland v. City of Taylor, 37 S.W.2d 291, affirmed, 123 Tex. 39, 67 S.W.2d 1033 (1931); Allydon Realty Corp. v. Holyoke Housing Authority, 23 N.E.2d 665 (Mass.Sup.Ct. 1939); Attorney General Opinions C-342 (1964) and C-464, and authorities therein cited.

Your first and fourth questions are therefore answered "Yes".

Your second inquiry is also answered in the affirmative. Your Department is authorized to pay per diem and travel expenses of the Committee members out of federal funds made available to the Department for the extension of the Day Care Program. As previously observed, the appointment of the Advisory Committee is mandatory under the statute, and under Sect. V, Section 27 of the General Appropriations Act (House Bill No. 12, Acts, 59th Legislature, Reg. Session 1965), the funds received from the federal government were expressly appropriated to the various Departments for their use and for the purposes for which the federal grant was made to the state. It is well-settled that the statute must be construed as a whole and with reference to the other statutes both state and federal, and general system of legislation of which it forms a part, giving full recognition to the legislative intent. 53 Tex.Jur.2d 180, Statutes, Sec. 125. Construing the statute in such light and giving it the required liberal interpretation, we conclude that the authority to pay reasonable and necessary per diem and travel expenses of the committee members must be held to have been conferred as a reasonable and necessary incident to committee service. It would be an unreasonable and unduly technical and harsh construction to expect citizens from various parts of the state to expend their own monies for such out of pocket expenses. Being within the general authorized purposes, the statute was not required to specifically enumerate these particular purposes in order to authorize the same. The general purposes are broad and comprehensive enough to authorize these necessarily implied and incidental expenses, which are distinguishable in law from salary or compensation, as is hereinafter noted.

Your third question asking whether employees of other state departments may serve on the Day Care Advisory Committee without jeopardizing or losing their salaries from the other state agency is likewise answered "yes". It is important to observe first that the membership on the Advisory Committee is not made an office or position of profit or emolument under the state or federal government. It provides for no salary or compensation, which is to be distinguished from out-of-pocket travel, subsistence, and other such per diem expenses, the payment of which may be properly authorized by law to state employees without violating any constitutional provisions, inasmuch as compensation is held to mean salary. Terrell v. King, 118 Tex. 237, 241, 14 S.W.2d 786, 791 (1929); State v.

Aronson, 314 P.2d 849, 853 (Sup. Ct. Mont. 1957); Kirkwood v. Soto, 87 Cal. 394, 25 P. 488 (1891); McCoy v. Handlin, 35 S.D. 487, 153 N.W. 361 (1915); Milwaukee Co. v. Halsey, 149 Wis. 82, 136 N.W. 139 (1912); Treu v. Kirkwood, 255 P.2d 409, 412 (Cal. Sup.Ct. 1953). It would not be an "office of profit or trust" under the Constitution, as in Sect. 12 of Art. 16, or "civil office of emolument" under Sect. 40 of Art. 16, or "office or position of honor, trust, or profit" under Section 33 of Art. 16.

We also hold that the place of membership on the Advisory Board or Committee would not rise to the dignity of "any other office or position of honor, trust . . . under this State or the United States. . ." within the constitutional meaning of such terms in Section 33 of Article 16, Texas Constitution, which states in part:

> "The Accounting Officers of this State
> shall neither draw nor pay a warrant
> upon the Treasury in favor of any
> person, for salary or compensation as
> agent, officer, or appointee, who
> holds at the same time any other office
> or position of honor, trust or profit,
> under this State or the United States,
> except as prescribed in this
> Constitution. . . ." (emphasis added)

This Section was not included in the Constitution of 1876 as a safeguard against a recurrence of the evils and abuses of the "carpetbag" era, since it made its first appearance in the Constitution of 1869, a constitution drafted by Reconstruction Republicans, and its policy reasons are at best conjectural. See Vol. 43, Tex.Law Review, p. 951; Tex.Const. Art. XII, Sec. 42 (1869).

The only policy basis for the section has been stated to be that of insuring full value for state services rendered in the payment of salary or compensation out of state monies. Thus the safeguard was aimed at preventing a person from holding at the same time two state offices or positions, or a state and federal office or position, the effect of which would cause that person to divide his time and fidelity, to the detriment of his state service. See Attorney General Opinion No. 0-2607 (1940); Vol. 43, Texas Law Review, p. 952.

In construing the meaning of the Constitution and statutes, a court will never adopt a construction that will make them absurd or ridiculous or one that will lead to absurd conclusions or consequences if the language of the enactment is

susceptible of any other meaning. 53 Tex.Jur.2d 241, 243, Statutes, Sec. 165.

Furthermore, wherever possible, that construction shall be adopted which shall promote the public interest in accord with sound economic or governmental policy. State v. DeGress, 72 Tex. 242, 11 S.W. 1029 (1888).

Generally, in arriving at the meaning of the Constitution, we find it should not be given a "narrow or technical construction" but it is to be given a "liberal meaning in order to effectuate the purpose of the provision of which it is a part" and "words will be considered to have been used in their natural sense and ordinary signification, unless the context indicates the contrary." 12 Tex.Jur.2d 362-363, Constitutional Law, Sec. 14; Sec. 16, p. 364, and cases there cited.

The words in the phrase "Office or position of honor, trust, or profit" are each words having a meaning ascertainable by reference to the other words with which they are associated under the maxim, noscitur a sociis. 53 Tex.Jur.2d 221, Statutes Sec. 154.

Thus, unless it is an office or position of honor or trust within the sense intended or meant by the Constitution, a State employee may serve in such a capacity and still draw his salary from the Comptroller.

The words "office or position of honor or trust" as used in Section 33 of the Constitution should be held to have been used analogously, and as having the same characteristics and general though not identical meaning, when given a practical, natural, ordinary, and reasonable construction. Webster's Third New International Dictionary, p. 1769; Black's Law Dictionary, 4th Ed., p. 1234, 33 Words & Phrases, p. 53, "Position;" and cases there annotated. The authorities hold that a "position" is analogous to an "office" in that the duties that pertain to it are permanent and certain. The same essentials, attributes, and characteristics are present insofar as the duties are governmental. Frazier v. Elmore, 180 Tenn. 232, 173 S.W.2d 563, 565; Fredericks v. Board of Health of Town of West Hoboken, 82 A.528, 529, 82 N.J.L. 200; Risley v. Board of Civil Service Comr's. of City of Los Angeles, 140 P. 2d 167, 169, 60 Cal.App.2d 32; Murphy v. Board of Chosen Freeholders of Bergen County, Sup., 163 A. 555, 556, 110 N.J.L. 9.

An "office" means "place" or "position" and they have been held to be substantially analogous and interchangeable

as understood in law.   29 Words & Phrases, p. 270, under
"Office -- Place or position"; and 1965 Pocket Part pp. 97-
98 and cases there annotated.

As stated in 22 R.C.L. 383, Sec. 16, Public Officers,

>     "Constitutions and laws sometimes
> contain provisions applying to offices of
> trust or honor and offices or places of
> trust or profit.  The line between 'offices'
> and 'places of trust or profit' within the
> meaning of such provisions has not been
> clearly marked, and they may be considered
> as approaching each other so closely that
> they are in all essential features identical.
> A place of trust or profit is not, however,
> identical with an office, yet it occupies
> the same general level in dignity and
> importance. . . ."

We have, therefore, heretofore correctly held on this
subject in Opinion No. 0-5341, dated July 19, 1943, that there
is no material legal distinction in meaning between the term
"office" and "position," and that as used in our Constitution,
such "position" or "office" means that the holder thereof must
exercise some governmental function, or be the depository of
some sovereignty of the state or the United States before it
rises to the dignity of an "office" under the state or United
States.  There must be delegated to the person holding such
"office" some of the sovereign functions of the state or the
United States Government.

We held in the Opinion as follows:

>     "There are several persuasive, though not
> conclusive, characteristics of what
> constitutes a public office; or to express
> it in another way, what constitutes hold-
> ing an 'office under the United States.'
> We mention a few: Tenure and duration,
> oath of office, official bond, etc.  But
> one indispensable characteristic, as the
> cases hereafter noted affirm, is that the
> duties performed shall involve the
> exercise of sovereign power, whether
> great or small.  Our own Supreme Court, in
> a comparatively early case, Kimbrough v.
> Barnett, 93 Texas 301, 55 S.W. 120, quoted
> with approval Mechem on Public Officers as
> follows:

> "'A public office is the right, authority,
> and duty created and conferred by law, by
> which, for a given period, either fixed
> by law or enduring at the pleasure of the
> creating power, an individual is invested
> with some portion of the sovereign
> functions of the government, to be
> exercised by him for the benefit of the
> public.'"

In the above Opinion No. 0-5341, and from the authorities we found that "office" had a definite legal meaning in the sense employed in the Constitution:

> "'The term "office" implies a delegation of
> a portion of the sovereign power to, and
> possession of, it by the person filling the
> office; a public office being an agency for
> the state, and the person whose duty it is
> to perform the agency being a public officer.
> The term embraces the idea of tenure,
> duration, emolument and duties, and has
> respect to a permanent public trust to be
> exercised in behalf of government, and not
> to a merely transient, occasional or
> incidental employment. A person in the
> service of the government who derives his
> position from a duly and legally authorized
> election or appointment, whose duties are
> continuous in their nature and defined by
> rules prescribed by government, and not by
> contract, consisting of the exercise of
> important public powers, trusts, or duties,
> as a part of the regular administration of
> government, the place and the duties
> remaining, though the incumbent dies or
> is changed, every office in the constitutional
> meaning of the term implying an authority
> to exercise some portion of the sovereign
> power, either in making, executing or
> administering the laws. Mechem on Public
> Officers, () 1-9.'"

The recent case of _Willis v. Potts_, 377 S.W.2d 622 (1964), by the Supreme Court of Texas, construing Art. 3, Sect. 19, and Art. 11, Sect. 5 of the Constitution, held that a City Councilman of the City of Ft. Worth held an "office under the State." Utilizing the reasoning of the earlier decisions, the Court's decision is in harmony with our Opinion and not in conflict with it or the distinction sought to be made.

Those authorities so construing the meaning of "office" or "position" as comprehending continuous performance of defined permanent public duties, compensation, tenure, exercise of sovereignty, and other essential requisites are in accord and are thoroughly discussed and briefed in our Opinion O-5341. See Witkowski v. Burke, 65 A.2d 781 (1949); Sowers v. Wells, 150 Kan. 630, 95 P.2d 281, 284 (1939); Abbott v. McNutt, 218 Cal. 225, 22 P.2d 510 (1933), 89 A.L.R. 1109; Howard v. Saylor, 305 Ky. 504, 204 S.W.2d 815 (1947); United States v. David Mouat, 124 U.S. 303, 307, 31 L.Ed. 463 (1888); People ex rel Attorney General v. Leonard, 14 P. 853 (1887); In Re Doe's Estate. In Re. Wheeler. Mallory, as Public Adm'r. v. Wheeler, 138 N.W. 97 (1912); Patten v. Miller, 8 S.E.2d 757 (1940); wherein the Supreme Court of Georgia approved of a state employee (member of the Highway Board) holding at the same time a position as a member of the Advisory Committee of the Atlanta Agency of the Reconstruction Finance Corporation, the Court holding that his office "is not an office of profit or trust under the Government of the United States"; Hartigan v. Board of Regents of West Virginia University, 38 S.E. 698 (1901); Hirschfeld Commonwealth ex rel Attorney General, 76 S.W.2d 47 (Ky. 1934); State ex rel v. Hawkins, 257 P. 411 (1927), 53 A.L.R. 583; and Kingston Associates v. La Guardia, 281 N.Y. Supp. 390 (1935), wherein it was held that members of the Advisory Committee on Allotments, created by the President of the U. S., were not holding an "office of honor, trust, or emolument under the government of the United States." The Court said:

> "'Clearly, the members of the Advisory Committee on Allotments possess none of the powers of the sovereign. They perform no independent governmental function. Such function in general is either legislative, judicial, or executive. It is too plain to require discussion that the Advisory Committee exercises no legislative or judicial prerogatives. It appears to be fairly evident that it likewise possesses no powers of the executive. . . . . The Committee thus lacks the most important characteristic or attribute associated with the idea of public office, namely, the right to exercise some part of the power of the sovereign.'"

Opinion O-5341, of July 19, 1943, that a District Attorney could receive his salary and also serve as Chairman of the Local Chapter of The American National Red Cross, a Corporation

chartered by Congress, because the latter was not an office or position under the United States, is consistent with our earlier Opinion No. 0-5314, of July 2, 1943, holding that a state or county official could not be excluded from drawing his salary while serving as a member of an advisory board for registrants, the latter not being a position of honor, trust or profit under this State or the United States within the contemplation of our Texas Constitution.

Our still earlier Opinion No. 0-4458, of April 8, 1942, holding that a state employee could serve without loss of salary as a member of a County Tire Rationing Board for the same legal reasons is likewise consistent with the above Opinions.

Our earlier and thoroughly considered Opinion No. 0-4313, of Jan. 24, 1942, written by Zollie C. Steakley, now a member of the Texas Supreme Court, is likewise consistent with the above opinions in holding that a state employee (member of State Board of Education) could still draw his salary and serve on an Alien Enemy Hearing Board, created by the federal government through the U. S. Attorney General, paying only nominal compensation but requiring the member to take an oath. The Board appointment was temporary, for an indefinite term, with only occasional meetings and sporadic activities. It was merely a fact finding and advisory administrative instrumentality, which could neither make nor enforce decisions. We expressly held that membership upon such a Board, which would be presumably identical to an Advisory Board or Committee, did not constitute the holding or exercising of an office of trust, honor, or profit under the United States. We there held that "it does not constitute a 'position' as that term was intended by the Framers of the Constitution."

The precise question has still never been determined by a Texas court but other jurisdictions are in general accord with our cited holdings.

In McIntosh v. Hutchinson, 59 P.2d 1117 (1936), the Supreme Court of Washington held that a State Senator could still draw his salary and serve as a "District Supervisor" of the Federal Works Progress Administration, which was not deemed to be the acceptance of a "civil office," citing Barney v. Hawkins, 79 Mont. 506, 257 P. 411 (1927), 53 A.L.R. 583, as to the meaning of the term "office," to-wit:

> "After an exhaustive examination of the
> authorities, we hold that five elements
> are indispensable in any position of
> public employment, in order to make it

a public office of a civil nature: (1)
It must be created by the Constitution
or by the Legislature or created by a
municipality or other body through
authority conferred by the Legislature;
(2) it must possess a delegation of a
portion of the sovereign power of
government, to be exercised for the
benefit of the public; (3) the powers
conferred, and the duties to be discharged,
must be defined, directly or impliedly,
by the legislature or through legislative
authority; (4) the duties must be per-
formed independently and without control
of a superior power, other than the law,
unless they be those of an inferior or
subordinate office, created or authorized
by the Legislature, and by it placed
under the general control of a superior
officer or body; (5) it must have some
permanency and continuity, and not be
only temporary or occasional.  In addition,
in this state an officer must take and
file an official oath, hold a commission
or other written authority, and give an
official bond, if the latter be required
by proper authority."

The Court concluded that the Senator was not appointed
to an office since "the great weight of authority well supports
the necessity of meeting all of the conditions laid down by the
Montana Court and . . . it is not made to appear that these
conditions, or any of them, have been here met . . .".

In accord and involving similar questions and constitution-
al prohibitions are State v. Corley, 172 A. 415 (Del. 1934);
Curtin v. State, 214 P. 1030 (Cal. 1923); Mulnix v. Elliott,
156 P. 216 (Colo. 1916); State v. Joseph, 78 So. 663 (La. 1918);
McCoy v. Board of Supervisors, 114 P.2d 569 (1941), citing
Carpenter v. Sheppard, 135 Tex. 413, 145 S.W.2d 562 (1940),
for the necessity of taking a liberal view toward the encourage-
ment of such enactments that their protective purposes "may be
fulfilled without undue imposition of constitutional limitations
or hinderance through narrow judicial construction."

In Parker v. Riley, 113 P.2d 873, 875-876, 18 Cal.2d 83
(1941), 134 A.L.R. 1405, the California Supreme Court upheld a
statute providing for the creation of the California Commission
on Interstate Cooperation and providing for members of the
legislature to serve thereon.  Although the Constitution

expressly prohibited the members from accepting "any office, trust, or employment under this state," the Court held that the constitutional meaning of "office" or "trust" was not applicable thereto as follows:

> "'It may be noted, however, that the positions created by the statute here attacked lack certain elements usually associated with an "office" or "trust". Thus, it is generally said that an office or trust requires the vesting in an individual of a portion of the sovereign powers of the state. (Citation of authorities) The positions here created do not measure up to so high a standard. They involve merely the interchange of information, the assembling of data, and the formulation of proposals to be placed before the Legislature. Such tasks do not require the exercise of a part of the sovereign power of the state.'"

The Riley case doctrine was recently recognized and re-affirmed by the Supreme Court of California in State v. Aronson, 314 P.2d 849, 856-857 (1957). In accord, see also Gillespie v. Barrett, 15 N.E.2d 513 (Ill. 1938); Johnson v. Chambers, 98 S.E. 263 (Ga. 1919); and Reading v. Maxwell, 52 P.2d 1155 (Ariz. 1935), for the proposition that certain essential elements are required to constitute an "office" or "position" as used in such constitutional sense and the meaning of these terms as so used do not preclude the accept-ance of such duties and service involving honor and trust and from which any citizen could not escape without evading his civic or patriotic duty to aid his government or country in times of temporary emergencies.

The terms "office" or "position" therefore necessarily implies, among other elements, compensation, stability, duration, permanency, continuity, taking oath and giving bond, and the making and administering of governmental decisions independently and without control of a superior power, etc. The substantial absence of these essentials appertaining to membership on a Day Care Advisory Committee frees a state employee from any constitutional inhibition to such service while continuing to draw his state salary.

In answer to your fifth question, that is, does your Department have the authority to pay the per diem and travel expenses solely out of federal funds upon a finding of necessity that such committee members attend the meetings

for the purpose of carrying out the provisions of the Acts, we have concluded that it may be answered in the affirmative. Under the general statutory scheme, and plan of operation, we hold that under the federal and state laws hereinabove discussed, the power is inherent in the Department of Public Welfare to take the necessary steps to comply with its authorized contractual agreement required to be filed with the Secretary of State before the federal funds can be expended and thereafter to use and expend such funds for the purposes for which they were allotted to the state without the necessity of a specific enumeration in the statutes. In this connection, we heretofore held in Attorney General's Opinion C-440 (May 12, 1965) that travel expenses of unpaid personnel, such as committee members while engaged in the performance of the official business of the committee, can be paid out of federal funds received by the State of Texas by virtue of the contractual agreement between the state and the federal government. The factual situation presented in that Opinion is analogous to the one here presented and is substantially the same. The state and federal government were authorized to enter into the contractual arrangement. We are unaware of any law of this state which would preclude the payment of such per diem or travel expenses out of the federal funds so appropriated in such general terms comprehensive enough to include such purpose and under the stated circumstances.

## S U M M A R Y

The State Department of Public Welfare is authorized to set up a Day Care Advisory Committee consisting of representatives of other State Departments or Agencies and representatives of other professional and civic groups for the purpose of complying with the federal requirement made the basis for the Department's receiving federal funds for the Day Care Program in the State of Texas.

It is empowered to set up other types of Advisory Boards or Committees of Public Welfare (unrelated to Day Care Advisory Committees) which are essential to the accomplishment of the other purposes of the Public Welfare Programs in Texas in accordance with the Department's agreement with the federal government.

It is authorized to pay per diem and travel expenses to the committee members out of federal funds made available to the Department for the extension of the Day Care Program.

Employees of the State Departments may serve on the Day Care Advisory Committee without loss of salary from the other state agency, such membership not constituting "an office or position of honor, trust, or profit, under this State or the United States" within the constitutional meaning of those terms in Section 33 of Article 16 of the Texas Constitution.

Yours very truly,

WAGGONER CARR
Attorney General

By: Kerns B. Taylor
Kerns B. Taylor
Assistant

KBT:dl

APPROVED:
OPINION COMMITTEE

W. V. Geppert, Chairman
Bob Flowers
Arthur Sandlin
H. Grady Chandler
Roger Tyler
Marietta Payne

APPROVED FOR THE ATTORNEY GENERAL
BY:   T. B. Wright